UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAWN OAKLEY,

      Plaintiff,

v.                            Case No. 8:25-cv-120-VMC-NHA

POLK COUNTY BOARD OF
COUNTY COMMISSIONERS,

      Defendant.

_____/

## ORDER

This matter comes before the Court pursuant to Defendant Polk County Board of County Commissioners' Motion for Summary Judgment (Doc. # 30), filed on November 24, 2025, seeking summary judgment on all claims in this Florida Civil Rights Act ("FCRA") and Title VII of the Civil Rights Act of 1964 case. Plaintiff Dawn Oakley responded on December 22, 2025. (Doc. # 33). The County replied on January 12, 2026. (Doc. # 36). For the reasons that follow, the Motion is granted.

## I.  Background

### A. Parties and County Policies

The Polk County Board of County Commissioners ("the County") is the governing body for Polk County, Florida. (Joe Decl. at ¶ 2). Polk County Fire Rescue ("PCFR") provides countywide ambulance transport and fire rescue services to

1

the unincorporated parts of the county. (Id. at ¶ 3). PCFR employees are trained and certified by the State of Florida as firefighters, emergency medical technicians ("EMTs"), or paramedics, or they can be dual certified as a firefighter/paramedic or firefighter/EMT. (Id. at ¶ 4).

In 2003, PCFR hired Ms. Oakley, a white woman, to work as an EMT. (Pl. Depo. at 12:4-8, 33:11-13). In 2018, Ms. Oakley obtained her firefighter certification and became a firefighter/EMT. She held this position in 2022. (Id. at 12:12-17, 14:24-25). Ms. Oakley was a member of the Polk County Professional Firefighters, IAFF - Local 3531 (the "Union"). (Id. at 14:3-9; Joe Decl. at ¶ 12). As such, she was subject to the collective bargaining agreement between the Union and the County, including its provisions about drug testing. (Pl. Depo. at 71:1-12; Joe Decl. at ¶ 12, Ex. 3 at 4-5). Ms. Oakley was also subject to the County's Employee Handbook and required to comply with PCFR's Code of Conduct. (Pl. Depo. at 71:8-10, 95:15-21; Joe Decl. at ¶ 11).

B. **Drug Testing**

Florida classifies firefighters and EMTs as safety sensitive positions and, as such, they are subject to drug and alcohol testing procedures. (Joe Decl. at ¶ 5). The County maintains a drug free workplace policy, which includes

2

procedures for conducting random drug testing of employees in safety sensitive positions. (Id. at ¶ 8, Ex. 1 at 11). Thus, employees in safety sensitive positions throughout the County, including PCFR, are obligated to undergo random drug testing. (Pl. Depo. at 118:5-11; Joe Decl. at ¶¶ 10-11, Ex. 1 at 11, Ex. 2 at 2-3). The drug free workplace guidelines are designed to protect the County from employees' use of illegal drugs, abuse of prescription drugs or alcohol at any time, as well as employees reporting for work or performing work under the influence of a non-prescribed substance, illegal drug, or alcohol. (Joe Decl. at ¶¶ 9, 11, Ex. 1 at 5, Ex. 2 at 2-3). PCFR employees must "strictly adhere" to the County's drug free workplace policies. (Id. at ¶ 11, Ex. 2 at 2-3). Randomly selected employees must submit to a breathalyzer test and provide a urine sample if selected for a random drug test. (Id. at ¶ 13).

The County's employee wellness center analyzes the breathalyzer test, and an independent third-party testing facility analyzes the urine sample. (Id. at ¶ 14). These tests are reviewed by a licensed physician who serves as the Medical Review Officer ("MRO"), and who applies federal regulations established by the United States Department of Transportation ("DOT"). (Id.; Berry Decl. at ¶¶ 3-4, 9).

3

On March 28, 2022, Ms. Oakley was selected to undergo a random drug test. (Pl. Depo. at 55:23-56:21; Joe Decl. at ¶ 18). Before she drove to Bartow where the test would be administered, Ms. Oakley took two pills from her to-go pill bottle that she believed were Tylenol to alleviate her back pain. (Pl. Depo. at 55:21-57:2, 101:1-20). But Ms. Oakley accidentally ingested her husband's Vyvanse, which she mistook for Tylenol. (Id. at 55:21-57:2, 58:6-8, 64:1-7, 75:9-18, 99:10-24, 101:1-20). The weekend before her drug test, Ms. Oakley put one of her husband's Vyvanse pills in her to-go pill bottle in case they decided to spend the night in Orlando after a concert. (Id. at 58:6-60:18). Ms. Oakley had forgotten about her husband's Vyvanse, failing to remove it from her to-go bottle. (Id. at 62:2-63:11). Ms. Oakley completed a breathalyzer test and provided a urine sample. (Id. at 56:14-17, Ex. 1).

On May 3, 2022, Ms. Oakley received an e-mail from Lashana Joe, the County's Employee Relations Manager, notifying her that she needed to speak with the MRO about her drug test. (Id. at 96:19-24; Joe Decl. at ¶ 21). That same day, Ms. Oakley spoke with a nurse from the MRO's office. (Pl. Depo. at 57:6-58:8). The nurse asked if Ms. Oakley had a prescription for Vyvanse or Adderall because there may have

been a "false positive" for amphetamines. (Id.). Because Ms. Oakley did not have a prescription for either drug, the nurse advised her that the MRO would call her. (Id. at 98:4-99:9).

Ms. Oakley spoke with MRO, Dr. Bruce Berry, MD, later that same day. (Id. at 99:6-24). Dr. Berry notified Ms. Oakley that she tested positive for amphetamines, and that he would send the results to the County. (Id. at 99:10-24). Ms. Oakley notified Dr. Berry that she could have taken Sudafed, and she may have mistakenly taken her husband's Vyvanse on the day of the test because she had confused it with Tylenol. (Id. at 99:10-24, 100:10-20).

Dr. Berry does not consider an individual's mistaken ingestion of a medication to be a basis to negate a drug test result. Rather, it qualifies as a positive drug test. (Berry Decl. at ¶ 12). DOT regulations do not authorize an MRO to consider an individual's explanations of a confirmed positive drug test result. (Id. at ¶ 10-12). Pursuant to the DOT regulations, an individual cannot claim that they mistakenly or unknowingly ingested a drug to avoid confirmation of a positive drug test. (Id.). When an individual tests positive for a drug, Dr. Berry classifies accidental ingestion of medication as a failed drug test. (Id. at ¶¶ 6, 12).

5

Ms. Oakley admitted to taking 70 milligrams of Vyvanse, and, although she did not feel any effects from the medication, she was still under its influence during her shift. (Pl. Depo. at 55:21-58:8, 64:1-7, 83:23-84:2, 126:19-128:7, 140:19-141:7). While Ms. Oakley was responsible for knowing what medication she took, she asserted PCFR should have provided her with a second chance to pass the drug test because she made a mistake. (Id. at 82:13-20; Joe Decl. at ¶¶ 27-28).

### C. Termination

On May 6, 2022, Ms. Joe and Deputy Fire Chief, Richard Parnell, met with Ms. Oakley and her Union representative to notify Ms. Oakley that Dr. Berry confirmed her positive drug test. (Pl. Depo. at 92:18-93:22; Joe Decl. at ¶ 25).

Ms. Joe notified Ms. Oakley that she would be terminated from her employment with PCFR, pursuant to its drug testing policies and procedures. (Pl. Depo. at 93:15-94:25; Joe Decl. at ¶ 26). Ms. Joe also advised Ms. Oakley that she could file a grievance through her Union or proceed through the employee Appeals Council if she wanted to challenge her termination. (Pl. Depo. at 29:16-25, 93:15-94:25; Joe Decl. at ¶ 30). Ms. Oakley told Ms. Joe she mistakenly took the medication and

6

"begged for a retest." (Pl. Depo. at 48:18-21, 93:23-94:12, 124:4-9).

During the meeting, Ms. Joe heard Ms. Oakley's explanation for the positive drug test; however, in accordance with the DOT standards and regulations, the County does not consider an individual's accidental or mistaken ingestion of another person's prescription medication to be a valid reason for overturning a positive test result or authorizing a retest. (Joe Decl. at ¶ 29; Berry Decl. at ¶¶ 10-12). Allowing an individual to retest on this basis defeats the purpose of the drug free workplace program. (Joe Decl. at ¶ 29).

Ms. Oakley appealed the termination decision to the Appeals Council. (Pl. Depo. at 93:24-94:25, Ex. 7 at 1). The Appeals Council consists of four County employees appointed by the County Manager. (Joe Decl. at ¶ 31, Ex. 6 at 1-2). The Council hears employees' appeals of disciplinary actions and communicates its findings to the County Manager. (Id.). Through the appeal, Ms. Oakley presented her case and submitted a written statement explaining her positive drug test. (Pl. Depo. at 107:8-10, 129:1-5, Ex. 6, Ex. 7). Following the hearing, the Appeals Council upheld Ms.

Oakley's termination, ending her employment with the County. (Id. at 104:6-11, 107:16-22).

### D. John Doe and Other County Employees

Ms. Oakley asserts the County discriminated against her because she is a white female. (Id. at 33:8-13, 34:1-4, 43:1-6). Ms. Oakley believes this because the County allowed John Doe, an African American man and PCFR employee, to retake his drug test after failing his first test. (Id. at 17:3-14, 33:8-34:15, 43:13-19, 132:3-134:9). But Ms. Oakley was not allowed to retake her drug test — a decision she attributes to discrimination. (Id.). Ms. Oakley does not allege the County discriminated against her in any other way. (Id. at 53:6-54:4).

In April 2022, Mr. Doe was selected for a random drug test. (Joe Decl. at ¶ 36). The County received notice that he tested positive for amphetamines on June 2, 2022. Upon receipt of this notice, the County's Human Resources department notified Mr. Doe of the results and its intent to move forward with his termination. (Id. at ¶ 37).

The County allowed Mr. Doe to address the test results. (Id. at ¶ 38). Mr. Doe presented a list of his prescribed medications and asserted he did not ingest anything else that could have resulted in the positive test. (Id.). He

8

explained the medication was part of a weight loss program. (Id.). At no point during the meeting did Mr. Doe admit to taking illegal drugs or prescription medication that was not prescribed to him. (Id. at ¶ 39). Based upon the information Mr. Doe provided, the County authorized a second drug test. (Id. at ¶ 40). Mr. Doe passed his second test and was allowed to remain employed by PCFR. (Id.).

Ms. Oakley does not have any direct knowledge of the circumstances surrounding Mr. Doe's drug testing or his employment with PCFR. (Pl. Depo. at 19:24–20:4, 22:3-14, 23:1-9, 40:21-41:1, 131:15-18, 136:4-9). She testified that she only heard that the County allowed Mr. Doe to retake an initial failed drug test from unnamed individuals at PCFR. (Id. at 133:15–135:10). Ms. Oakley assumes Kandis Baker-Buford, the Director of Equity and Human Resources, approved Mr. Doe's retest because he is part of a "diversity program." (Id. at 18:2-7, 19:5-8, 27:3-7). Further, Ms. Oakley believes Mr. Doe "has been put on a pedestal" and "he's been coddled," being "basically [Ms.] Baker-Buford's sidekick for years." (Id. at 66:23–67:11). Ms. Oakley believes the County did not terminate Mr. Doe because he is an African American male and was a member of the County's diversity program. (Id. at 17:3-14, 18:2-7, 27:3-7; 34:16-21, 41:1-19, 134:14-

21). Ms. Oakley does not know if the County terminated any African American firefighter/EMTs or male employees in general for failing a random drug test. (Id. at 39:24-40:12). But she did admit that every case concerning discipline of employees is different. (Id. at 66:7-22).

Polk County applies the MRO's findings and conclusions regarding a drug test pursuant to its corresponding policies and procedures. (Joe Decl. at ¶¶ 15-16, Ex. 1). Specifically, if the MRO reports a positive test result for an individual, the County applies the disciplinary standards from its drug free workplace policy. (Id. at ¶¶ 15-18, Ex. 1 at 14). In doing so, it provides each employee an opportunity to explain or contest the test results. (Id. at ¶ 16).

The County has consistently terminated firefighter/EMTs and any other individuals in safety sensitive positions who fail a drug test. (Id. at ¶ 33). It does not issue less severe discipline following an *unexcused*, positive drug test. (Id.). From January 2015 through December 2023, Polk County either terminated or allowed resignation in lieu of termination for 14 employees after positive random drug tests. (Id. at ¶¶ 34-35, Ex. 7). Eight of these employees, including Ms. Oakley, worked for PCFR. (Id. at ¶ 34). The group included two African American males, one Hispanic

male, and one white male. (Id.). The fifth male did not disclose his racial identity, so that remains unknown. (Id.). In addition to Ms. Oakley, two white females have also been terminated for positive drug tests. (Id.). Four white males and two Hispanic males who worked in the County's other divisions also lost their jobs after positive drug tests. (Id.).

### E. Procedural History

Ms. Oakley initiated this action against the County in January 2025. (Doc. # 1). In her complaint, Ms. Oakley asserts the following claims: (1) gender discrimination in violation of the FCRA (Count One); (2) race discrimination in violation of the FCRA (Count Two); (3) gender discrimination in violation of Title VII (Count Three); and race discrimination in violation of Title VII. (Id.). The County answered the complaint (Doc. # 18), and the case proceeded through discovery.

The County now seeks summary judgment on all claims. (Doc. # 30). Ms. Oakley has responded (Doc. # 33), and the County has replied. (Doc. # 36). The Motion is ripe for review.

11

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

12

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

13

## III. **Analysis**

### A. **Failure to Dispute the County's Statement of Material Facts**

As an initial matter, Ms. Oakley's response violates the Court's requirements for summary judgment briefing, as laid out in a February 21, 2025 order. (Doc. # 23). The Court requires every response to a summary judgment motion to

> include a section titled "Response to Statement of Material Facts." The opposing party's response must mirror the statement of material facts by admitting and/or denying each of the moving party's assertions in matching numbered paragraphs. Each denial must set forth a pinpoint citation to the record where the fact is disputed. Although the opposing party's response must correspond with the paragraph scheme used in the statement of material facts, the response need not repeat the text of the moving party's paragraphs. In deciding a motion for summary judgment, the Court will deem admitted any fact in the statement of material facts that the opposing party does not specifically controvert, provided record evidence supports the moving party's statement.

(Id. at 2-3).

Ms. Oakley's response does not respond at all to the County's statement of material facts in its Motion. (Doc. # 33). Ms. Oakley, thus, has failed to dispute any of the County's numerous statements of material fact. Therefore, provided the record evidence cited by the County supports each statement, the Court deems admitted all facts in the Motion's statement of material facts.

14

B.      **The Merits**

In its Motion, the County argues that Ms. Oakley's claims fail under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In response, Ms. Oakley argues that her claims survive summary judgment under either the McDonnell Douglas framework or the convincing mosaic of circumstantial evidence approach. (Doc. # 33 at 3-9).

"In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in" McDonnell Douglas. Id. "When proceeding under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." Id. at 1220-21. "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Id. at 1221.

15

"Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination.'" Id. (citation omitted).

However, "establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). Alternatively, "[a] 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019). The convincing mosaic approach "is not more forgiving than the [McDonnell Douglas framework] on the final question, which is whether a reasonable jury could infer illegal discrimination."

16

McCreight v. AuburnBank, 117 F.4th 1322, 1335 (11th Cir. 2024).

Here, Ms. Oakley's gender and race discrimination claims fail under either the McDonnell Douglas framework or the convincing mosaic approach. No reasonable jury could conclude that the County discriminated against Ms. Oakley based on her race or gender. Ms. Oakley does not dispute that she was randomly selected for drug testing and that she tested positive for a drug that she was not prescribed and, therefore, had unlawfully (albeit accidentally) taken. See Pears v. Mobile Cnty., 645 F. Supp. 2d 1062, 1090 (S.D. Ala. 2009) (noting that "a positive drug test" "unquestionably" qualifies as "a legitimate nondiscriminatory reason" to discharge an employee). The evidence that Ms. Oakley relies on to create a genuine dispute of material fact about discrimination includes: (1) Mr. Doe's being allowed to take a second drug test when Ms. Oakley was not, and (2) the severity of terminating a long-time employee with no other disciplinary history, rather than allowing her to retest. (Doc. # 33 at 7).

First, John Doe is not a sufficient comparator to establish a prima facie case of discrimination under McDonnell Douglas or support a convincing mosaic of

17

discrimination. "[A] plaintiff asserting an intentional-discrimination claim under <u>McDonnell Douglas</u> must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" <u>Lewis</u>, 918 F.3d at 1218. "A plaintiff needn't prove . . . that she and her comparators are identical save for their race or gender." <u>Id.</u> at 1227. "Nor is it necessary for a plaintiff to prove purely formal similarities — *e.g.*, that she and her comparators had precisely the same title." <u>Id.</u> A similarly situated comparator, however, ordinarily "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history." <u>Id.</u> at 1227-28. "[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" <u>Id.</u> at 1228 (citation omitted).

Here, Mr. Doe was not similarly situated in all material respects to Ms. Oakley. Ms. Oakley admitted that she took her husband's prescription medication, which caused her positive drug test. She did not argue that the drug test was a false

18

positive; rather, she argued her inappropriate use of another's prescription medication was accidental. But accidental ingestion of another person's prescription medication is still considered a positive drug test under the DOT regulations. (Berry Decl. at ¶¶ 10-11). Dr. Berry, the MRO working for the company contracted by the County to perform drug testing, averred that he does "not consider an individual's claim that she mistakenly took another person's prescription medication to be a reason to negate a positive drug test." (Id. at ¶ 12). Likewise, Ms. Joe averred that the County "does not consider a person's accidental or mistaken ingestion of illegal drugs or another person's prescription medication to be a valid reason to overturn a positive drug test or to allow a retest" because doing so "would defeat the purpose of the drug free workplace program." (Joe Decl. at ¶ 29). Thus, in the County's eyes, Ms. Oakley admitted she had engaged in misconduct and her positive drug test was considered "unexcused."

In sharp contrast, Mr. Doe denied taking any illegal drugs or prescription drugs not prescribed to him. (Id. at ¶¶ 38-39). That is, he admitted no wrongdoing. See Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000) (finding that plaintiff who "freely admitted having taken $10.00 from the

19

cash register" was not similarly situated to other employee who "never confessed to taking county funds for personal use"). Mr. Doe instead presented a list of his prescription medications, including a medication prescribed for weight loss, presumably to show his positive drug test was a false positive caused by his prescription medication. (Id.).[1] As a result of this explanation, the County considered Mr. Doe's positive drug test "excused," which led to Mr. Doe being allowed to take a second drug test that was negative. (Id. at ¶ 40). Thus, Ms. Oakley and Mr. Doe did not engage in the same conduct, rendering them materially dissimilar.

Even aside from considering him a true comparator, the decision not to fire Mr. Doe could not persuade a reasonable jury that discrimination was the reason for Ms. Oakley's termination. Ms. Oakley's testimony that Mr. Doe was a favorite of HR because of his participation in the County's diversity program, (Pl. Depo. at 18:2-7, 19:5-8, 27:3-7, 66:23-67:11), was speculation not based on personal

---

[1] In her response, Ms. Oakley states that she disputes that Mr. Doe "presented prescriptions and therefore warranted a retest." (Doc. # 33 at 5). However, Ms. Oakley asserts this "dispute" without citation to any record evidence. Therefore, Ms. Joe's declaration regarding the circumstances of Mr. Doe's positive drug test and retest is undisputed.

knowledge. Likewise, Ms. Oakley had no personal knowledge about why Mr. Doe was allowed a retest beyond rumors she heard. (Id. at 19:24-20:4, 22:3-14, 23:1-9, 40:21-41:8, 131:15-18, 136:4-9). Nevertheless, Ms. Oakley insists that disregarding her speculative testimony is equivalent to "improperly weigh[ing] credibility." (Doc. # 33 at 6). Not so. "[I]nferences in favor of a plaintiff can be based only on evidence — not on speculation." Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048, 1058 (11th Cir. 2020). "Even on summary judgment, a court is not obliged to take as true testimony that is not based on personal knowledge." Citizens Concerned About Our Child. v. Sch. Bd. of Broward Cnty., 193 F.3d 1285, 1295 n.11 (11th Cir. 1999).

Additionally, there is undisputed evidence that multiple County employees of different races and genders were also terminated or forced to resign after positive drug tests. These include eleven men of various races, including two African American men and three Hispanic men. (Joe Decl. at ¶¶ 34-35). Besides Mr. Doe, there is no evidence that other men or non-white employees who tested positive for drug use kept their jobs. See Crawford v. Newport News Indus. Corp., No. 4:14-cv-130, 2018 WL 4561671, at *53 (E.D. Va. Mar. 2, 2018) (granting summary judgment on race discrimination claim where

21

a plaintiff "failed to identify a single white employee who was not terminated after a positive drug test," and, in fact, there was a white employee who was likewise "required to submit to drug testing, and upon a positive result, was terminated"), report and recommendation adopted in part, No. 4:14-cv-130, 2018 WL 2943445 (E.D. Va. June 11, 2018). And Ms. Oakley has not presented evidence of any statements evincing discriminatory animus by her superiors or the decisionmakers for her termination. Given the number of men of various races whose employment ended after positive drug tests and the County's undisputed explanation that it considered Mr. Doe's positive drug test "excused," the single example of an African American man being allowed to retake his drug test does not raise a reasonable inference of race or gender discrimination.

True, "[p]roof that an employer failed to follow its established policies in reaching an employment decision may be evidence of pretext." Harley v. The Health Ctr. of Coconut Creek, Inc., 487 F. Supp. 2d 1344, 1354 (S.D. Fla. 2006). But here, taking the facts in the light most favorable to Ms. Oakley, the County did follow its policy on discipline after a positive drug test for both Ms. Oakley and Mr. Doe. According to Ms. Joe, it is the County's policy to "provide

22

each employee an opportunity to explain or contest the test results" after a positive drug test. (Joe Decl. at ¶ 16). It is undisputed that the County gave both Ms. Oakley and Mr. Doe an opportunity to explain their positive drug tests. Ms. Oakley and Mr. Doe gave different explanations for their positive drug tests. The County determined that only Mr. Doe's explanation sufficiently "excused" his positive test and warranted a retest. Because the County considered Ms. Oakley's positive test "unexcused," the County followed its policy of ending the employment of those with unexcused positive drug tests when it terminated Ms. Oakley, as it had also done with numerous other employees. (Id. at ¶ 34). Thus, the County did follow its policy as to both Ms. Oakley and Mr. Doe.

Ms. Oakley's other arguments are also unavailing. First, she cites no record evidence for her assertion that she "had an unblemished 19-year record as a firefighter/EMT." (Doc. # 33 at 8). Ms. Oakley did not include her lack of prior discipline in her own statement of material facts (Id. at 2-3), and does not cite any record evidence for this alleged fact elsewhere in her response. More fundamentally, even assuming she had no disciplinary history, the decision to fire a long-time employee for testing positive for drugs not

23

prescribed to her does not raise the specter of pretext. In an undisputed declaration, Ms. Joe explained that she was "not aware of the County issuing less severe discipline to *any* employee following an unexcused, positive random drug test." (Joe Decl. at ¶ 33) (emphasis added).

Ms. Oakley argues that termination was a draconian punishment for a good employee who made a mistake. The Court tends to agree and has sympathy for Ms. Oakley. But this Court cannot second guess whether the County's decision was "prudent or fair." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 2003); see also Dent v. Fed. Mogul Corp., 129 F. Supp. 2d 1311, 1315 (N.D. Ala. 2001) ("Although termination may, to some, seem a draconian response given the level of Plaintiff's offense, the reasonableness of Defendant's disciplinary policies is not a consideration in determining whether Plaintiff has produced sufficient evidence to prevail on his claims of race and sex discrimination.").

This Court does "not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII] does not interfere." Elrod v. Sears,

24

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted). "[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Equal Emp. Opportunity Comm'n v. STME, LLC, 938 F.3d 1305, 1320 (11th Cir. 2019) (citation omitted). While it may have been fairer for the County to retest Ms. Oakley rather than terminate her, Ms. Oakley has not demonstrated a genuine dispute of material fact as to whether the County's decision was discriminatory based on her race or gender.

The Motion is granted on all claims.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant Polk County Board of County Commissioners' Motion for Summary Judgment (Doc. # 30) is **GRANTED.**

(2)  The Clerk is directed to enter judgment in favor of Defendant Polk County Board of County Commissioners and against Plaintiff Dawn Oakley on all counts of the complaint.

(3)  Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

25

26

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>4th</u>
day of March, 2026.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE